## In re LANDSBERGER.

(District Court, N. D. Georgia. March 4, 1910.)

No. 2,339.

BANKRUPTCY (§ 140*)—ASSETS—OWNERSHIP—CONSIGNMENT.

Evidence *held* to warrant a finding that intervener's consignment of goods purchased at a sale in bankruptcy in prior proceedings to the bankrupt was fraudulent as against the bankrupt's subsequent creditors, and that the price of the goods which the bankrupt agreed to return to intervener had been paid, so that intervener was not entitled to recover from the trustee, in a subsequent proceeding as against the bankrupt's creditors, the goods consigned and remaining unsold or their proceeds.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

In the matter of bankruptcy proceedings against A. Landsberger. On the intervening petition of M. G. Samuels to recover from the trustee certain goods alleged to have been consigned to the bankrupt for sale at an advance of 25 per cent. of the inventory price. On review of referee's decision denying petition. Affirmed.

Slaton & Phillips, for trustee in bankruptcy.
Wimbish, Watkins & Ellis, for intervener and bankrupt.

NEWMAN, District Judge. This case arose on the intervening petition of M. G. Samuels, doing business under the name of M. G. Samuels & Co., as a merchant at 19 Bond street, New York City.

In his intervening petition Samuels claims that at the time of a former proceeding in involuntary bankruptcy against Landsberger, commenced in May, 1908, he bought Landsberger's stock of merchandise at the sale by the trustee in bankruptcy, on June 29, 1908, and that, after adding some goods to the stock so purchased and selling off some, he consigned what was left, by a contract in writing, to A. Landsberger. The consignment agreement is as follows:

"City of Baltimore, Md.

"This agreement, made and entered into between M. G. Samuels, of the city and state of New York, and A. Landsberger, of the city of Atlanta, state of Georgia, witnesseth:

"That the said M. G. Samuels has consigned to the said A. Landsberger the merchandise set forth and fully described on the attached inventory. Said merchandise is to be and remain the property of said Samuels, and said Landsberger is to have no right nor title therein other than the right to sell the same upon a commission of twenty-five per cent. over and above the cost price as shown on said inventory. Promptly upon sale of each article thereof the said Landsberger shall remit to the said Samuels the purchase price thereof, less the commission allowed. Said Landsberger agrees during the time said

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

goods remain in his possession under this consignment that he will keep the same insured for the benefit of the said Samuels.

"In witness whereof, both parties have hereunto set their hands and seals this the ―――― day of August, 1908.      [Signed]    M. G. Samuels.   [Seal.]
                                                "[Signed]    A. Landsberger.   [Seal.]
    "Signed, sealed, and delivered in the presence of:
                                                "[Signed]    John R. L. Sniffin.
    "Sworn to and subscribed before me on this the 22d day of September, 1908.
                                        "[Signed]    John R. L. Sniffin,
        "[Seal.]                                Notary Public No. 88, Kings County.
    "Certificate filed in New York county."

The goods appear to have been turned over to Landsberger on August 4th; but, as will be seen, the contract was not signed until September 22, 1908. Probably no particular significance is to be attached to this, however, as it appears that Landsberger left Atlanta on the 4th or 5th of August and went north to buy goods.

An inventory is attached to the consignment contract showing goods consigned of the value of $15,411.80, and fixtures of the value of $1,098. These goods appear to be a general stock of dry goods and clothing, including hats, caps, shoes, etc., also, apparently, a lot of millinery.

Landsberger left Atlanta, as stated, on the 4th or 5th of August, and went north to buy goods to replenish the stock. He bought about $23,-000 worth of new goods and shipped them to Atlanta, and they were placed in stock with these old, consigned goods. The goods were bought by him in his own name and shipped to him in that way. They were put in the same store and mingled, necessarily, with the old goods.

At the time of the purchase by Samuels of Landsberger's stock of goods in June, 1908, or at least about the 1st of July, 1908, a man who had been associated in business with Samuels, in New York, one Isaac Shafarman, came to Atlanta and took charge of the business for Samuels. After the consignment on August 4th, he continued in the store and was there until the 29th of September, 1908, at least.

Immediately after this fire another proceeding in involuntary bankruptcy was filed against Landsberger; that is, the proceeding in which the present intervention is filed by Samuels.

This fire in November, 1908, according to the proofs made to the insurance company, caused the entire destruction of $6,276 worth of goods and damage to the remainder of the stock amounting to $11,795. Some objection appears to have been made by the insurance company to settling the loss, and it was finally compromised by the trustee in bankruptcy, with the apparent consent of all parties, for $12,000, in full of total loss and damages.

An agreement was entered into after the fire, between the trustee in bankruptcy and Landsberger, by which Samuels was allowed to take steps to have his goods remaining in the store identified and an apportionment made between the goods consigned and the new goods, and a further agreement that the insurance loss should be considered as having been in the same proportion as this identification made between the consigned goods and the new goods.

The trustee in bankruptcy denies that the consignment by Landsberger to Samuels was in good faith; indeed, it is urged that, before this written contract of consignment was entered into, Landsberger had repaid Samuels the amount paid by him for the stock of goods at the sale in June, 1908, $12,600. It is claimed that there were large sales of goods, more than acknowledged by Samuels, from the time he re-opened the store, about the 1st of July, until August 4th, and enough to have paid Samuels back a large part of the purchase money of the stock at the bankrupt sale.

On August 4, 1908, Landsberger received his discharge in the first bankruptcy proceeding and immediately went to the Fourth National Bank in Atlanta and borrowed $5,000, of which he gave to Samuels $4,500. The evidence shows without question that Samuels was to pay certain bills for Landsberger, which seem to have reduced the amount left in Samuels' hands to about $3,000. Over this $3,000 there is a sharp contention as to whether it was given back by Samuels to Landsberger, or whether Samuels retained it.

Then it is said that, adding the $23,000 worth of new goods to the old stock, makes $37,000 or $38,000 worth of goods, in the aggregate, in the store after the alleged consignment on August 4th, up to the date of the fire. The goods in the store at the time of the fire amounted to approximately $22,000.

Samuels claims that of the goods sold during this period, from August 4th to the date of the fire, he did not receive one dollar, although the consignment contract provided that he should receive the cost price as shown by the inventory as the same were sold and upon each article sold.

Shafarman was in the store all the time as the representative of Samuels, and it is urged that it is absurd to say that, with this contract and with Shafarman in the store all the time, Samuels received no part of the proceeds from the goods disposed of, but that, on the other hand, he must have received enough, together with the sales from July 1st to August 4th, and with the $3,000, to have more than paid his debt.

In addition to the payments insisted on as above, it is claimed that one Philip Elson obtained from Landsberger about $8,000 worth of goods at 65 cents on the dollar of their original cost, and that he paid this money, five thousand and odd dollars, to Samuels. There is considerable evidence and much contention about the giving of certain notes in this connection.

The admissibility of a large part of the evidence as to this transaction is based upon the claim of counsel for the trustee that there was a conspiracy which originated in May, 1908, between Leon Eplan, Philip Elson, Landsberger, and Samuels, which, anticipating that Landsberger was about to fail and go into bankruptcy shortly thereafter, contemplated that Samuels would buy Landsberger's stock when it was sold by the trustee in bankruptcy, and put Landsberger back into business in Landsberger's own name, and Landsberger would then go on to the eastern markets and buy a large stock of goods and fail again, when Eplan and Elson would buy the stock.

Eplan did business next door to Landsberger and was a tenant of

Landsberger's, who leased the two stores from Joel Hurt. The lease from Hurt had some time to run and was considered valuable.

Just before the first failure in May, 1908, Elson, after a conference with Eplan, went to see Landsberger and got Landsberger to agree to transfer the lease of the store occupied by Landsberger to Eplan, and then they obtained the consent of Hurt to this transfer; the purpose being, and the promise being, according to the evidence, that, when Samuels bought the stock back for Landsberger, the lease should be retransferred to Landsberger, which would enable him to state to the persons from whom he desired to buy a new stock of goods that he had a valuable lease in his own name and had gone back into business in his old place.

Leon Eplan, in his testimony, after stating that he did business at 44 Decatur street, Atlanta, Ga., and that Landsberger's store was next door to his, was asked this question:

"Q. Mr. Eplan, I will get you to state whether some time prior to the 11th of May, 1908, you had any conversation with Philip Elson or A. Landsberger in reference to the lease on the premises then occupied by A. Landsberger. * * *

"A. Two or three days before the failure of Mr. Lansberger—the first failure; yes, sir—me and Mr. Elson were walking home. We had been neighbors for years, and friends for 20 years, and naturally, as usual, we knew that it was going to happen, as far as the failure was concerned, and we were talking about it, what made him fail, and so on, and I told Mr. Elson if I could get hold of that stock I would not mind going into business. That store done from $75,000 to $90,000 a year. Mr. Elson says: 'I will tell you, Mr. Eplan, I have already spoken to Mr. Landsberger, and he says he will not remain here in business under no conditions, and that he will go out of town as soon as he settles his failure, and he promised me the store.' So I says: 'Mr. Elson, it seems like your opinion and my opinion about the store is equal. How would you like for us to go in together in that business?' He said: 'It would be perfectly satisfactory. My business does not pay me, and I am dealing with my customers, that are mainly small men, and my money is all the time tied up with other people. Landsberger does a better retail business than I do wholesale, and I would not mind going in with you.' And by the time we got through with that (we lived right opposite each other) I went in to dinner. Coming out from dinner, usually I take a car, but I saw Mr. Elson, and says: 'Let's not take that car. Let's walk up town once.' And so we did. We were talking, of course, about this Landsberger matter, and I said: 'The first thing we will have to do is to secure the lease, so the lease would not go into the bankruptcy court, because, if the stock is sold with the lease and all, naturally it will bring a bigger price. I can't get the lease from Landsberger because Landsberger came pretty near fighting me before, and he owed me money, and refused to pay me. You also know he tried to get from me $2,000 a week or so before he left for New York, and I didn't give it to him. I told him the reason I couldn't give it to him was because he and Mr. Ottley had a fight, and I didn't want to go to Mr. Ottley for money, and I didn't, because I wanted to get out of the loan.' So the reason I wanted to get out of the loan—Landsberger always owed me from $4,000 to $5,000—was because I went once to the bank to deposit a check of his, and the receiving teller took Landsberger's check for $200, and went to the books to see whether the amount was good. This was something that had never happened before, and that gave me some suspicion; so I wanted to get out as best I could without making any more loans. 'Well,' Elson says, 'leave that to me. Landsberger will give me that lease, and you can attend to the transfer from Mr. Hurt.' The property belongs to Joel Hurt. We figured out that it would take us $15,000 to do business in that store, do it legitimately, and that was all the money we needed. We also figured that neither one of us would attend to the business directly. Elson claimed that he could buy goods cheaper than Landsberger did, some goods 15 per cent. to 20 per cent. cheaper. We decided that Mr. Elson would

be the buyer, and I would be the financier of the business. By the time we reached the store, and separated—it didn't take more than a couple of hours—Mr. Elson came back with the lease in his pocket.

"Q. What did it have on it when it came back?

"A. Just as you see it, with the exception of the transfer.

"Q. What did you do with it then?

"A. We went up to see Mr. Ellis on Mr. Elson's advice, and we asked Mr. Ellis a point in regard to the lease, and he says, 'I will represent Mr. Landsberger, and I would rather you would leave the transfer to somebody else.' So we went off. I went up to Mr. Herbert Haas, and he made that transfer, and Mr. Landsberger signed it. I went up to Mr. Hurt, and told him about it. He says: 'Eplan, I can't conform to it. Mr. Landsberger has been a tenant of mine so many years, and I had rather see him first.' So Mr. Hurt sends down his man to see Mr. Landsberger in the Kimball House. Landsberger refused to go up there. * * * I went up to Mr. Hurt afterwards, and Mr. Hurt transferred the lease.

"Q. After Landsberger had signed it?

"A. Yes, sir.

"Q. What day was that?

"A. Well, the 11th, I guess.

"Q. Do you recall how many days afterwards the bankruptcy happened to Landsberger?

"A. Maybe a day or two days—something like that."

After some other testimony not so material, Eplan's testimony proceeded as follows:

"Q. Didn't you confer with Elson in regard to selling the lease, and didn't Elson tell you that he promised Landsberger that, if Landsberger desired to enter the business again, he would not interfere with his plan?

"A. Yes, sir.

"Q. Didn't Landsberger tell you he had arranged with Samuels, to whom he was considerably indebted, to buy the stock of goods for him?

"A. Yes, sir.

"Q. And that Samuels would put Landsberger back into business?

"A. Yes, sir.

"Q. And he told you that he didn't want you to interfere with this plan?

"A. Yes, sir.

"Q. You told him you would not?

"A. I told him I would not as long as Mr. Elson agreed to let him have the store.

"Q. Afterwards you saw Samuels, and he confirmed that statement?

"A. Yes, sir.

"Q. When Samuels bought the goods, then he began to have a big, fine bankrupt sale down there?

"A. Yes, sir.

"Q. And moved part of these goods to Peachtree street?

"A. Yes, sir.

"Q. Now, the—you wanted to let them have it by the month?

"A. Yes, sir.

"Q. Then they stated to you that that was not agreeable, that they wanted a lease for a year in order that, when Landsberger went back into the market, it would appear that Landsberger had gone to the market, because he had bona fide gone back into business?

"A. Yes, sir.

"Q. Then Samuels and Landsberger stated to you that they didn't expect this business to run for more than four or five months?

"A. A short while.

"Q. But that they wanted the written lease, as they wanted to show that Landsberger was in business?

"A. Yes, sir.

"Q. Elson told you to let them have it for the little while, and you would be able to buy the next stock—that was the next Landsberger failure?

"A. Yes, sir.

"Q. That was what he had reference to—that Landsberger was going to fail again, and you would buy that stock?

"A. Yes, sir.

"Q. Now, then, Landsberger, he told you, didn't he, that he and Samuels agreed that the business should be turned over to him (Landsberger)?

"A. Yes, sir; he told me that, as soon as Mr. Samuels drew out enough money to reimburse him, he would have it.

"Q. And that Landsberger would go into market, and buy as many goods as possible?

"A. Yes, sir.

"Q. That he had made a satisfactory adjustment of his affairs, and that this bankruptcy sale had paid off most of the indebtedness?

"A. Yes, sir."

The referee, after reciting the testimony of the various witnesses, states this:

'The referee heard all of the witnesses at length except Landsberger, and carefully observed their manner during the course of the delivery of their testimony, and from the conflicts in evidence that have been given in reference to the transaction, and from the entire complexion of this case, as disclosed by a very lengthy record, the referee is satisfied that the evidence does demonstrate that a conspiracy existed as between Samuels and Landsberger for the purpose of defrauding creditors; that in pursuance of this conspiracy a contract of consignment was made, and at the time no such sum was due Samuels; that on the 4th of August, 1908, he was paid the sum of $4,500 by check, which Landsberger succeeded in obtaining from the Fourth National Bank under the statement that he was the owner of the stock of goods, and of which sum Samuels retained at least $3,000; that, while Shafarman was in charge of the store, goods of the value of nearly $23,000 were received from bona fide creditors; that most of these goods were disposed of, and no satisfactory account has been given of the proceeds arising therefrom by any of the witnesses; and it is from these goods that the referee believes Samuels received the proceeds to a large extent, especially on the Elson transaction. The referee finds that the notes of Elson, discounted by the New York banks, were not accommodation discounts, but were payments made to Samuels for goods out of the Landsberger stock. Further, that, prior to the fire, any sum which might have been due Samuels by Landsberger had long since been satisfied, and the referee is of the opinion that, in fact, no bona fide consignment was in existence either at the date it purports to have been made, or at any time subsequent thereto, and that its existence has been, at all times, a mere cover for the purpose of defrauding creditors.

"According to the contention of Samuels, from the date the goods were turned over, August 4, 1908, until after the fire, he received nothing from Landsberger. Can it be possible that Samuels would have permitted Landsberger to remain in possession of a consigned stock of goods from August 4th, on to some time late in November, without obtaining the proceeds from the sale of such consigned goods, especially during the period when his man Shafarman was in possession, from August 4th, to September 29th? The referee cannot believe that any man would have permitted such a course of dealings. Samuels knew personally, as well as through his said representative, Shafarman, that goods were being disposed of, and why did he not demand his money or his goods? The other special representative, Jacobs, came down to investigate, and, after having been in town only a few hours, was seized with this usual 'comfortable feeling' as to the conduct of the business, and immediately left the city for Wilmington, N. C. Jacobs' investigation didn't touch the books, or the cash account, and only amounted to an inquiry as to the general condition of the business. The only thing that Samuels, or his representatives, did on their visits here was in reference to the change of the fire insurance policies, all of which Landsberger had put in his own name; he stating to Hatcher that he owned the stock.

"Counsel for intervener were forced to take the position that Landsberger, the bankrupt, has not accounted for some $14,000 of cash sales. The referee

is of the opinion that the evidence is conclusive that, instead of Landsberger having this $14,000, it is accounted for to a large extent by the Elson transaction, who paid for goods to the extent of over $5,000, and this on a basis of about 65 cents on the dollar, which would account for some $8,000 of goods, and that the balance, if any, came into Shafarman's hands, while in charge of the store from August 4th to September 29th, and that Shafarman was at all times simply the representative of Samuels.

"The referee therefore is of the opinion that no bona fide contract of consignment exists; that Samuels has received in excess of the amount advanced by him on account of his purchase of the stock of goods; that he has no interest in the goods or the proceeds arising from the sale thereof; that the same belong to the bankrupt, Landsberger; that no bona fide claim on the part of this intervener exists; that there is no genuine basis for this intervention; and that the same should be denied. And it is so ordered."

The referee evidently believed that there was an understanding between Samuels, Landsberger, Elson, and Eplan from the time the first failure of Landsberger was contemplated, by which all were to be benefited, and that the purpose was not only to defraud the existing creditors of Landsberger, but those who should become his creditors in the future by the purchase of new goods, and that consequently all the testimony of Eplan should be considered; that is, as to what he did and what all the other parties to the alleged conspiracy did and said.

Whether this be true or not, there is enough testimony of Eplan, if it is to be believed, as to what he was told by Samuels and Landsberger, to justify the referee in concluding that this consignment was not in good faith and was fraudulent as against those from whom Landsberger intended to buy goods, and who are the creditors proving claims in this bankruptcy proceeding.

Undoubtedly the referee was justified in believing that the consignment was not in good faith in the sense that Samuels expected these goods to be sold and the proceeds derived from the sale of these particular goods to be paid over to him. It is perfectly clear that the purpose must have been to pay Samuels from the sales made, without reference to whether they were consigned goods or new goods, even assuming that the consignment was really made and that at that time Landsberger was still indebted to Samuels. It would have been a practical impossibility to have kept a separate account of the sales of consigned goods and at what they were sold, and there is not the slightest evidence to show that this was attempted.

I think the referee was fully justified, also, in concluding that, even if Samuels had not been paid back on August 4th the amount advanced by him for the purchase of the stock in June, he had certainly been fully paid before the fire. In their brief, counsel for Samuels concede that Landsberger has not accounted for $14,000 of cash sales. If, as the referee finds, Philip Elson got $8,000 worth of goods, for which he paid Samuels, and Samuels received, through Shafarman, $6,000 of the proceeds of goods sold while Shafarman was in charge, this would be the easiest and most natural way to account for this discrepancy.

I do not think the conclusions reached by the referee were, as contended by counsel for Samuels, based on mere suspicion, but they seem to me to be based on facts that appear in the record. That is, taking the fact that Shafarman was there in charge of the new stock as it

arrived and was being sold out, as Samuels' representative, and the fact that the consignment contract provided that the goods should be paid for as each article was sold, and then the fact of the failure to account for the $14,000 of goods or of cash received, one or the other, is it unfair to conclude that, notwithstanding Samuels' and Shafarman's denial, Samuels did receive this $14,000? That is a conclusion from the conceded facts. In view of Shafarman's presence in the store as the representative of Samuels, and his relation to the business, it would be almost as if the goods were turned over to Samuels in person, to the amount of $37,000, and $14,000 of them were missing, and his only reply was, "I don't know what became of them." This certainly would not be accepted in any court.

My conclusion is that the referee was justified in determining this matter as he did. If Samuels had not been paid in full on the 4th of August, it is perfectly clear from the evidence, to me, that he had been paid a considerable part of it, and, in view of the sales made afterwards by Landsberger which are unaccounted for, it is reasonable and fair to conclude, under all the evidence, that the goods, or the proceeds of the sale of the goods, must have gone to Samuels.

The well-recognized rule is that the conclusions of the referee on questions of fact will not be interfered with unless clearly and manifestly erroneous. This cannot be said of the conclusions of the referee in the present case. The referee had before him all these witnesses except Landsberger, saw them while being personally examined and cross-examined, and was far better able to get at the truth of this transaction than is the court, from the record. This of itself would prevent the court from interfering with the referee's finding; but I have gone through the record with considerable care. and the evidence is not only sufficient to support the finding of the referee, but seems to me to require it.

The action of the referee in finding against Samuels' intervening petition is confirmed and approved.